GRIFFIS, P.J.,
for the Court:
¶ 1. Silver Land, Inc. filed this breach-of-contract lawsuit against Isle of Capri Casinos, Inc. (Isle of Capri) and Riverboat Corporation of Mississippi-Vieksburg (Riverboat-Vicksburg). The circuit court granted Silver Land’s motion for partial summary judgment as to liability, i.e., breach of contract. The issue of damages was presented to the jury, and the jury returned a verdict in the amount of $1,979,182. The motions for summary judgment filed by Isle of Capri and Riverboat-Vicksburg were denied.
¶ 2. On appeal, Isle of Capri and Riverboat-Vicksburg argue that it was error for the circuit court to enter a partial summary judgment as to liability, and that they were entitled to a judgment as a matter of law. Finding error, we reverse and render judgment in favor of Riverboat-Vicksburg and Isle of Capri.
FACTS

I. The Parties

¶ 8. Silver Land owns real property along the Mississippi River in Natchez, Mississippi. Silver Land leased this property for use in the gaming industry. Silver Land is owned or controlled by James M. Biglane, who also owns or controls a substantial interest in United Mississippi Bank (UMB). As a result of Biglane’s common ownership or control, Silver Land’s lease agreements provide that UMB must be allowed to provide automated teller machine (ATM) services to the gaming company that leases Silver Land’s real property.
¶ 4. Isle of Capri is a publicly held gaming corporation with a number of subsidiaries. Isle of Capri, through its subsidiaries, owns and operates casinos in six states, including Mississippi.
¶ 5. Riverboat-Vicksburg is a wholly owned subsidiary of Isle of Capri. It owned and operated the hotel and casino in Vicksburg that is at issue in this appeal.
¶ 6. Lady Luck Mississippi, Inc. (Lady Luck) began the operation of a casino in Natchez in 1991. Lady Luck executed the original lease with Silver Land and used the leased property in its casino operations. When the lease was executed, Lady Luck was owned by Lady Luck Gaming Corporation. In 1999, Isle of Capri acquired Lady Luck Gaming Corporation. As a result, Lady Luck became a subsidiary of Isle of Capri. Lady Luck’s name was changed to IOC-Natchez, Inc. on July 31, 2000. Despite the acquisition and name change, the same entity has continuously operated the Natchez casino since 1991. (The Natchez casino will be referred to as “Lady Luck” even though its actual legal name is IOC-Natchez, Inc.) Lady Luck is not a party to this litigation.
¶ 7. Legends Gaming, LLC (Legends), in 2006, purchased the Vicksburg casino from Riverboat-Vicksburg. Legends is not a parent, subsidiary, affiliate, joint *591 venturer or partner of Isle of Capri or Riverboat-Vicksburg. Since the purchase, Legends has continuously operated the Vicksburg casino. Legends is not a party to this litigation.

II. The Agreements

A. The Natchez Lease

¶ 8. On October 29, 1991, Silver Land and Lady Luck executed an agreement for the lease of real property in Natchez, Mississippi. The lease allowed Lady Luck to use Silver Land’s property in the operation of its riverboat-casino operations. The primary term of the lease was for forty years, which began on the date Lady Luck began operation of Lady Luck Casino on Silver Land’s property in Natchez.
¶ 9. On December 31, 1992, Silver Land and Lady Luck executed an “Amended and Restated Lease Agreement” (Amended Lease) for the lease of real property in Natchez, Mississippi. Section 17 of the Amended Lease granted Lady Luck the right to “convey and assign and sublease its rights which it acquires from Silver Land hereunder,” but limited the right to make such an assignment to only “any subsidiary or other affiliate or to any joint venturer or partnership in which Lady Luck or such other subsidiary or other affiliate is a joint venturer or partner.” Lady Luck also agreed to a specific limitation on its right to sublease or license portions of the leased premises to others. In consideration for the lease, Lady Luck agreed that UMB would have the exclusive right to operate ATMs on the leased premises of any vessel docked on the premises that Lady Luck owned or controlled.
¶ 10. In 1998, Lady Luck sought to move its riverboat casino from “Old Ferry Ramp” to the “Queen Ramp” “Under the Hill” in Natchez. As a result, on August 21, 1998, Lady Luck and Silver Land executed the “First Addendum to Amended and Restated Lease Agreement” (Addendum).
¶ 11. Under the Addendum, Lady Luck maintained the authority to assign its rights under the lease only to an affiliate, joint venture, or partnership in which Lady Luck or such subsidiary is a joint venturer or partner. However, Lady Luck’s right to sublease or license parts of the premises was amended to give Biglane the right to choose the banking institution to be used for the ATMs on any vessels owned or controlled by Lady Luck, its assignees, subsidiaries, affiliates, partners, or joint ventures or parties within Mississippi. Also, the Addendum provided that, if Lady luck exercised its limited right to convey, assign, or sublease its rights under the lease, the transfer would also be subject to the requirement to use the bank designated by Biglane for ATM services.
¶ 12. These three agreements (collectively referred to as the “Natchez Lease”) were between Silver Land and Lady Luck and only related to the Natchez property. When these agreements were executed, neither Isle of Capri nor Riverboat-Vicksburg had a relationship with Lady Luck. Legends has never had a relationship with Lady Luck.
¶ 13. On October 5, 1999, Isle of Capri purchased Lady Luck Gaming Corporation, the parent corporation of Lady Luck. As a result, Isle of Capri and Riverboat-Vicksburg became an “affiliate”[1] of Lady *592 Luck under the Natchez Lease. At the time, Isle of Capri also owned and operated casinos in Lula, Natchez, Tunica, Vicksburg and Biloxi, Mississippi.
¶ 14. Shortly thereafter, counsel for Isle of Capri assured Silver Land that Isle of Capri intended to honor the Natchez Lease:
Isle of Capri intends to fully comply with all of Lady Luck’s lease obligations under the Silver Land Lease. Isle of Capri is willing to allow United Mississippi Bank to install its ATMs on its other vessels in the state provided we can reach an agreement regarding a “commercially reasonable rate” for the other vessels, and for Natchez and Coa-homa when the current contracts expire.
Biglane designated UMB to provide ATM services at all of the newly affiliated properties, including the Vicksburg casino.

B. The ATM Agreement

¶ 15. On October 31, 2001, Silver Land and Isle of Capri executed an “Automated Teller Machine Operation Agreement” (ATM Agreement). The ATM Agreement specifically referred to the Natchez Lease and provided that: “Isle hereby grants Silver Land exclusive rights to provide ATM services in hotel and theater pavilions at Tunica and Vicksburg in addition to rights currently possessed by Silver Land to provide such service on all vessels at all casino locations in Mississippi.” The ATM Agreement acknowledged that Isle of Capri could not grant exclusive rights to its Biloxi casino due to an existing contract. The ATM Agreement provided:
1. Services to be Provided by Isle. Isle hereby grants Silver Land exclusive rights to provide ATM services in hotel and theater pavilions at Tunica and Vicksburg in addition to rights currently possessed by Silver Land to provide such services on all vessels at all casino locations in Mississippi.
4. Services to be Provided by Silver Land. In consideration for the rights granted by Isle to Silver Land as set forth herein, Silver Land agrees to provide ATM Services (as defined below) to the Isle at the following Mississippi locations: Natchez (a minimum of 3 ATMs to be installed and maintained at locations identified by the Isle), Lula (a minimum of 5 ATMs to be installed and maintained at locations identified by the Isle), Tunica (a minimum of 3 ATMs to be installed and maintained at locations identified by the Isle) and Vicksburg (a minimum of 4 ATMs to be installed [and] maintained at locations identified by the Isle)....
5. Compensation. Silver Land hereby agrees to pay to Isle 40% of the fee income derived from ATM locations in Vicksburg and Tunica. Silver Land shall retain the right to 100% of the fee income from the ATM locations in Lula as well as the ATMs located in Natchez and, subject to Paragraph 6 below, waives fee income from ATM locations in Biloxi.
6. Isle’s Biloxi Location. The parties acknowledge that Isle’s Biloxi property is provided ATM services by People’s Bank, and that the terms of this Agreement do not apply to the Biloxi property at this time. The parties agree that in the event the Isle terminates its relationship with People’s Bank ... then the Isle’s Biloxi location shall become subject to the terms of this Agreement.
9. Ratification. The provisions of that Lease, as amended by the Addendum to *593 Lease dated August 21, 1998, in particular, Section 17 thereof, remain in effect and are in full force and effect other than as specifically clarified hereby.
¶ 16. According to the ATM Agreement, Isle of Capri, through its subsidiaries, allowed UMB’s ATMs to be placed in its properties in Lula, Tunica, and Vicksburg. The appropriate compensation from ATM operations was then paid to Silver Land.

C. The Sale/Purchase Agreement of the Vicksburg Casino to Legends

¶ 17. In 2006, Riverboat-Vicksburg sold the Vicksburg casino to Legends. Isle of Capri, the owner of Riverboat-Vicksburg, signed the sale/purchase agreement with Legends (Legends Agreement). The Legends Agreement provided:
2.02 Purchase and Sale of Purchased Assets. On the terms and subject to the other provisions of this Agreement, including Section 2.03, at the Closing [Riverboat-Vicksburg] shall grant, convey, sell, transfer and assign to [Legends] ... and [Legends] ... shall purchase from [Riverboat-Vicksburg,] ... and accept the assignment relating to, all of the Sellers’ right, title and interest in and to the assets, rights and properties of the Sellers at the Effective Time that are used predominantly in the operation of the Vicksburg Business ... whether or not carried and reflected on the books of the Sellers, in each case, free and clear of all Liens other than Permitted Liens....
Among Riverboat-Vicksburg’s assets sold to Legends were several specifically identified contracts related to the operation of Vicksburg casino. Riverboat-Vicksburg did not assign the Natchez Lease to Legends. Riverboat-Vicksburg explained that the Natchez Lease was not assigned to Legends because it was not an asset of Riverboat-Vicksburg and was not related to the operation of the Vicksburg casino.
¶ 18. UMB learned of the sale of the Vicksburg casino. UMB notified Isle of Capri that it believed the ATM Agreement created continuing ATM obligations that followed Legends as Isle of Capri’s assign-ee. UMB demanded that Isle of Capri inform Legends of the ATM Agreement and provide an acknowledgment by Legends of the assumption of the obligations in the agreement. Isle of Capri responded that Legends was “not an assignee, subsidiary, affiliate, [or] joint venturer partner of Lady Luck” but offered to make an introduction of Silver Land if it were interested in establishing an independent business relationship with Legends. Silver Land did not respond. Legends decided that its Vicksburg casino would not continue to use UMB’s ATMs. Legends contracted with another entity to provide ATM services at the Vicksburg casino.

III. The Litigation

¶ 19. On February 12, 2009, Silver Land commenced this litigation in the Circuit Court of Adams County, Mississippi. Silver Land filed a complaint that named Isle of Capri and Riverboat-Vicksburg as defendants. Silver Land asserted a claim for breach of contract. Silver Land demanded a judgment for consequential damages, attorneys’ fees, costs, interest, and such other relief that was proper.
¶ 20. Silver Land’s breach-of-contract claim asserted that Isle of Capri and Riverboat-Vicksburg breached Section 17 of the Addendum and the ATM Agreement. Specifically, Silver Land alleged that Isle of Capri and Riverboat-Vicksburg were obligated to not allow any banking institution other than UMB, or any other banking institution designated by Biglane, to utilize the Isle of Capri Casino in Vicksburg for a banking facility or ATM. In *594 assigning its rights in the Vicksburg casino to Legends, Isle of Capri and Riverboat-Vicksburg refused to require Legends to assume the Addendum and ATM Agreement. An entity other than Silver Land has been providing ATM services at the Vicksburg casino “at the riverboat formerly known as Isle of Capri Casino-Vicksburg.” Silver Land was damaged by this breach by lost revenue from operation of ATMs in the Isle of Capri Casino-Vicksburg.
¶ 21. Isle of Capri and Riverboat-Vicksburg filed a motion for summary judgment. Silver Land filed a motion for partial summary judgment on the issue of liability. The circuit court denied the defendants’ motions for summary judgment and, on January 4, 2011, granted Silver Land’s motion for partial summary judgment. The court found that Isle of Capri and Riverboat-Vicksburg breached the contracts with Silver Land.
¶ 22. A jury trial began on September 13, 2011. The jury was asked only to consider the issue of damages. The jury awarded Silver Land damages of $1,979,182. On September 23, 2011, the circuit court entered a final judgment for Silver Land.
¶23. On October 20, 2011, the circuit court denied the defendants’ motion for a judgment notwithstanding the verdict or for a new trial. On October 31, 2012, the circuit court entered an amended agreed order that reduced the post-judgment interest rate.
STANDARD OF REVIEW
¶ 24. Our standard of review for a grant of summary judgment is the same standard as that of the trial court under Rule 56(c) of the Mississippi Rules of Civil Procedure. McMillan v. Rodriguez, 823 So.2d 1173, 1176-77 (¶ 9) (Miss.2002).
This Court employs a de novo standard of review ... and examines all the evi-dentiary matters before it — admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law, summary judgment should ... be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says ... the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant should be given the benefit of the doubt.
Id. (citation omitted).
ANALYSIS
¶ 25. There is no genuine issue of a material fact in dispute. The issue before us is whether Silver Land was properly entitled to a partial summary judgment, or whether Isle of Capri or Riverboat-Vicksburg was entitled to a summary judgment.
¶ 26. Silver Land’s brief notes that the briefs submitted in this appeal “seem like two ships passing in the night.” They do, indeed. Since Isle of Capri and Riverboat-Vicksburg are separate legal entities, we review the claims against them separately.
7. Whether Riverboah-Vicksburg breached its contract with Silver Land.
¶ 27. We begin with Silver Land’s claim against Riverboat-Vicksburg. Silver Land has alleged that Riverboat-Vicksburg *595 breached a contract; when Riverboat-Vicksburg assigned its interest in the Vicksburg casino to Legends, it failed to include in that assignment its ATM obligations to Silver Land or to otherwise provide for Silver Land’s rights. Riverboat-Vicksburg counters that there is no agreement that required it to assign the Addendum or ATM Agreement to Legends.
¶ 28. Riverboat-Vicksburg was not a signatory to the Natchez Lease or the ATM Agreement. Yet Riverboat-Vicksburg was held to be in breach of these contracts as a matter of law by the trial court. We look at each of these agreements.
¶ 29. As to the Natchez Lease, Section 17 of the Addendum reads:
LADY LUCK may convey and assign and sublease its rights which it acquires from SILVER LAND hereunder to any subsidiary or other affiliate or to any joint venture or partnership in which LADY LUCK or such subsidiary or other affiliate is a joint venturer or partner. LADY LUCK may also sublease and/or license portions of the Leased Premises for concession and similar uses, except for use as a banking facility, as hereinafter agreed, or as prohibited in Section 29.
Reading this section, we recognize that Riverboat-Vicksburg was an “affiliate,” but we find no language in this provision that would require an affiliate to assign Silver Land’s rights to a third party on the sale of the property. The sale of the Vicksburg casino to Legends without the assignment of the Natchez Lease was not required of Riverboat-Vicksburg and was not a breach of the Natchez Lease by Riverboat-Vicksburg.
¶ 80. Riverboat-Vicksburg did not sign the ATM Agreement. The ATM Agreement was between Silver Land and Isle of Capri. Riverboat-Vicksburg was a wholly owned subsidiary of Isle of Capri. Through the ATM Agreement, Riverboat-Vicksburg’s parent, Isle of Capri, instructed its subsidiary to allow UMB to install and operate its ATMs at Riverboat-Vicksburg’s casino and property. The ATM Agreement placed a contractual obligation on Isle of Capri, not Riverboat-Vicksburg. While Riverboat-Vicksburg was a party to the Legends Agreement, the ATM Agreement cannot be read to have required Riverboat-Vicksburg to do anything that it had not agreed to do. The ATM Agreement gave Silver Land no contractual rights against Riverboat-Vicksburg.
¶ 31. In its brief, Silver Land argues that Isle of Capri, not Riverboat-Vicksburg, was the party that terminated the existing ATM contract at the Vicksburg casino to allow UMB ATMs to be installed. And, when Isle of Capri told UMB to remove its ATMs from the Vicksburg casino, Isle of Capri explained that it had entered into an agreement to sell the casino and hotel in Vicksburg to Legends.
¶ 32. The trial court’s partial summary judgment does not clearly state the basis relied upon to find Riverboat-Vicksburg liable to Silver Land. The dissent argues that the corporate veil should be pierced, but does not specify which corporation’s veil should be pierced. These conclusions are simply not supported by the evidence in the record before the Court; for instance, there is no evidence to support the conclusion that the “Isle of Capri and Riverboat-Vicksburg operated as alter egos in acting as mere instrumentalities of the other’s economic benefit,” they “disregarded corporate formalities,” and they “acted as a single economic unit.”
¶ 33. The following portion of Silver Land’s brief identifies the issue: “Isle of Capri should not be able to avoid its obli *596 gations under the Lease Agreement by hiding behind its wholly-owned subsidiary.” Silver Land does not argue that Riverboat-Vicksburg’s corporate veil should be pierced. Silver Land does not argue or present any evidence that “Isle of Capri and Riverboat-Vicksburg operated as alter egos in acting as mere instrumen-talities of the other’s economic benefit,” they “disregarded corporate formalities,” or they “acted as a single economic unit.” Instead, each of these conclusions comes from the dissent’s research and consideration of this case.
¶ 34. Silver Land’s brief does not argue that Riverboat-Vicksburg should be liable; instead, it argues that Isle of Capri should be liable. The content of Silver Land’s argument, which followed the above heading, states:
Even if the Court were to somehow hold that, despite this considerable body of evidence to the contrary, Legends is solely an assignee of Riverboat, the mere fact that Isle of Capri used this wholly-owned subsidiary to escape its contractual obligations to Silver Land should not relieve it of liability. This Court has held that such intra-corporate gymnastics cannot be used in such an inequitable way: “ ‘The fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote fraud or illegality or injustice.’” Beco, Inc. v. American Fidelity Fire Ins. Co., 370 So.2d 1343, 1346 (Miss.1979).
¶ 35. Beco simply does not support Silver Land’s or the dissent’s position. Beco, Inc. brought an action on a performance bond to recover for the costs of materials provided on a construction project. Bob Wolfe d/b/a Bob Wolfe Electric Company entered a contract to perform electrical work at the Bank of Indianola. B.J. Wolfe Sr. entered a bond with the insurance company for performance of the construction contract on the bank’s building. Beco supplied materials for Bob Wolfe Electric Company to use in the project. Beco was not paid $8,555.03 for materials delivered to the job. Beco claimed the insurance company was obligated for this amount on its bond. The evidence revealed that B.J. Wolfe Sr., also known as Bob Wolfe, was an electrical contractor who did business under the name Bob Wolfe Electric Company and Wolfe Electrical Company, Inc. Mr. Wolfe and both companies operated from the same post-office box and physical location. The bond was signed by Wolfe under the name Bob Wolfe Electrical Company, which was the entity with the construction contract. Beco’s electrical-supply invoices were sold to Wolfe Electric at Wolfe Electric’s post-office box, and the materials were delivered to and used in the construction at the bank. The trial court directed a verdict in favor of American Fidelity Fire Insurance Company, because it found Beco dealt exclusively with Wolfe Electric Company, Inc. and not with Bob Wolfe Electric Company.
¶ 36. The supreme court reversed the directed verdict. The court concluded that the contract was in fact performed by Bob Wolfe Electric Company, and the evidence required the “inescapable conclusion that B. (Bob) J. Wolfe, Sr. (only signature on bond) was the real actor, whether as an individual or by his family corporation. It is difficult to see how appellee was misled or prejudiced by what transpired, in dealing with Mr. Wolfe.” Id. at 1345. The court held:
Although Wolfe was engaged in corpo- ■ rate and individual operations, the following general principle is significant:
“According to a number of cases, the notion of separate corporate existence of parent and subsidiary or affiliated *597 corporations will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation. The fiction of separate corporate identity of two corporations will not be extended to permit one of the corporations to evade its just obligations or to promote fraud or illegality or injustice.” 18 Am.Jur.2d Corporations § 17, at 565-66 (1965).
Beco, Inc., 370 So.2d at 1346.
¶ 37. The facts in Beco are not similar to the facts here. There is simply no evidence anywhere in the record that Isle of Capri or Riverboat-Vicksburg attempted to “evade” their “just obligations” or in any way promoted “fraud or illegality or injustice.” See id. The dissent, sua sponte, has raised the claim that the corporate veil of Isle of Capri should be pierced to allow Silver Land to recover from Riverboat-Vieksburg. There is absolutely no evidence in the record that would support a judgment that would pierce the corporate veil of Isle of Capri or Riverboat-Vicksburg.
¶ 38. Silver Land’s argument, quoted above, is that Riverboat-Vicksburg is liable simply because it is the wholly owned subsidiary of Isle of Capri. This finding is contrary to the basic principles of Mississippi corporate law.
¶ 39. In Buchanan v. Ameristar Casino Vicksburg, Inc., 957 So.2d 969, 978 (¶ 28) (Miss.2007), the supreme court held:
[OJrdinarily two or more corporations are separate and distinct entities although the same individuals are the in-corporators of, or own stock [in,] the several corporations, and although such corporations may have the same persons as officers. A corporation also retains a separate identity for corporation purposes when stock is owned wholly or in part by another corporation or natural person. Further, ownership of all the stock of a corporation coupled with common management and direction does not, however, operate as a merger of the two corporations into a single entity. This Court will not disregard corporate identity unless it is shown that one corporation is a “mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation.
(Internal citations and quotation marks omitted). Isle of Capri and Riverboat-Vicksburg are separate, independent entities and are entitled to be treated as such. Liability cannot and does not automatically attach to Riverboat-Vicksburg simply because it is a subsidiary corporation of Isle of Capri. The dissent’s position, if accepted, would substantially alter Mississippi corporate law.
¶ 40. Based on our de novo review of Riverboat-Vicksburg’s motion for summary judgment and Silver Land’s motion for partial summary judgment as it relates to Riverboat-Vicksburg, we simply cannot find an enforceable contractual obligation between Silver Land and Riverboat-Vicksburg. As Silver Land’s brief aptly points out, Isle of Capri was the entity that owed Silver Land obligations under Section 17 of the Addendum and the ATM Agreement. Therefore, we find that there is no genuine issue of a material fact in dispute and that Riverboat-Vicksburg is entitled to a judgment as a matter of law. We reverse the circuit court’s entry of partial summary judgment against Riverboat-Vicksburg and render a judgment as a matter of law that dismisses Riverboat-Vicksburg from this action. Riverboat-Vicksburg is hereby dismissed with prejudice.

*598
II. Whether Isle of Capri breached its contract with Silver Land.

¶ 41. Next, we consider Silver Land’s claim against Isle of Capri. Silver Land has alleged that Isle of Capri breached a contract when Isle of Capri assigned its interest in the Vicksburg casino to Legends, and it failed to include in that assignment its ATM obligations to Silver Land or to otherwise provide for Silver Land’s rights. Isle of Capri counters that there is no agreement that required it to assign the Addendum or ATM Agreement to Legends and that neither section 17 of the Addendum nor the ATM Agreement obligated Isle of Capri to “assign” either agreement to Legends.
¶42. Unlike Riverboat-Vicksburg, Isle of Capri was bound by two contracts. First, when it purchased Lady Luck, Isle of Capri became contractually bound to Silver Land under the terms of the Natchez Lease. Also, the ATM Agreement was actually signed by Isle of Capri and Silver Land. Therefore, we must interpret these two agreements to determine if Isle of Capri breached either contract.

A. Mississippi Law on Contract Interpretation

¶ 43. The Mississippi Supreme Court has set forth a detailed analysis for contract-interpretation cases. In Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc., 857 So.2d 748, 751-53 (¶¶ 7-11) (Miss.2003), the court held:
The question of law/question of fact dichotomy requires a two-step inquiry in contract law. First of all, it is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written. Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder. Appellate courts review questions of law de novo.
In the event of an ambiguity, the subsequent interpretation presents a question of fact for the jury which we review under a substantial evidence/manifest error standard. If the terms of a contract are subject to more than one reasonable interpretation, it is a question properly submitted to the jury.
The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties. In contract construction cases a court’s focus is upon the objective fact — the language of the contract. [A reviewing court] is concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other. A reviewing court should seek the legal purpose and intent of the parties from an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. The reviewing court is not at liberty to infer intent contrary to that emanating from the text at issue.
This Court has set out a three-tiered approach to contract interpretation. Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. First, the “four corners” test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. We must look to the “four corners” of the contract whenever possible to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best *599 resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties’ apparent intent. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties’ true intent. The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law. Secondly, if the court is unable to translate a clear understanding of the parties’ intent, the court should apply the discretionary “canons” of contract construction. Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party. Finally, if the contract continues to evade clarity as to the parties’ intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements and conversations might be considered in determining the parties’ intentions in the construction of the contract. Of course, the so-called three-tiered process is not recognized as a rigid “step-by-step” process. Indeed, overlapping of steps is not inconceivable.
(Emphasis added and internal citations and quotation marks omitted).
¶ 44. The initial question for this Court to decide is whether the applicable agreements are ambiguous. This determination is a matter of law for this Court to decide. If we conclude that the contracts are not ambiguous, this Court, just as the circuit court, may then effectuate the parties’ intent. If this Court determines the contracts are ambiguous, “the subsequent interpretation presents a question of fact for the jury....” Id. at 752 (¶ 8). “If the terms of a contract are subject to more than one reasonable interpretation, it is a question properly submitted to the jury.” Id.

B. Circuit Court’s Grant of Partial Summary Judgment in Favor of Silver Land

¶ 45. Although our standard of review is de novo, we start with the decision by the circuit court. The circuit court concluded that the contracts were unambiguous, that there was no genuine issue of a material fact in dispute, and that Silver Land was entitled to a judgment as to liability as a matter of law.
¶ 46. In the order granting partial summary judgment, the circuit court ruled:
1. [Lady Luck] and [Silver Land] entered into an Amended and Restated Lease Agreement on or about December 31,1992.
2. [Lady Luck] and [Silver Land] entered into a First Addendum to the Amended and Restated Lease Agreement on or about August 21, 1998.
3. [Isle of Capri] entered into an Automated Teller Machine Operation Agreement with [Silver Land] on or about October 31, 2001.
4. [Isle of Capri] ratified and adopted the December 31, 1992 Amended and Restated Lease Agreement between [Silver Land] and [Lady Luck] and the August 21, 1998 First Addendum thereto.
5. Pursuant to the Amended and Restated Lease Agreement, the Addendum thereto and the Automated Teller Machine Operation Agreement, [Isle of Capri] and its wholly *600 owned subsidiary, [Riverboat-Vicksburg], were obligated to include the exclusive right of United Mississippi Bank, or such other banking institution as James M. Biglane may designate, to provide banking and ATM services at the Isle of Capri Casino-Vicksburg in the transfer and assignment of that property to [Legends].
6. [Isle of Capri and Riverboat-Vicksburg] failed to include the exclusive right of United Mississippi Bank, or such other banking institution as James M. Biglane may designate, to provide banking and ATM services at the Isle of Capri Casino-Vicksburg in the transfer and assignment of that property to [Legends].
IT IS THEREFORE ORDERED AND ADJUDGED that [Isle of Capri and Riverboat-Vicksburg] breached their contracts with [Silver Land] and are liable to [Silver Land] for all damages caused by their breach.

C. This Court’s Analysis

¶ 47. The circuit court determined that Isle of Capri breached both the Natchez Lease and the ATM Agreement. We analyze each agreement.

1. The Natchez Lease

¶ 48. The ATM Agreement begins with several recital paragraphs that specifically refer to the Natchez Lease. Paragraph 9, titled “Ratification,” states that “[t]he provisions of [the Natchez] Lease, as amended by the Addendum to Lease dated August 21, 1998, in particular, Section 17 thereof, remain in effect and are in full force and effect other than as specifically clarified hereby.”
¶ 49. Section 17 in the original lease is titled “Right to Convey, Assign or Sublet.” In the Amended Lease and the Addendum, Section 17 actually contains two separate and distinct contractual obligations.
' ¶ 50. The first part of section 17 is consistent with the title. The first and second sentence of Section 17 of the Addendum reads:
LADY LUCK may convey and assign and sublease its rights which it acquires from SILVER LAND hereunder to any subsidiary or other affiliate or to any joint venture or partnership in which LADY LUCK or such subsidiary or other affiliate is a joint venturer or partner. LADY LUCK may also sublease and/or license portions of the Leased Premises for concession and similar uses, except for use as a banking facility, as hereinafter agreed, or as prohibited in Section 29.
This language limits to whom Lady Luck (now an Isle of Capri-owned entity, IOC-Natchez, Inc.) could “convey and assign and sublease its rights” under the Natchez Lease. Under this provision, Lady Luck (IOC-Natchez, Inc.) could have assigned the Natchez casino to Isle of Capri or Riverboat-Vicksburg but could not have assigned or subleased the Natchez casino to Legends.
¶ 51. The second part of this provision has nothing to do with the title of the section. The third sentence of section 17 deals not with the “Right to Convey, Assign or Sublet” the Natchez property, but instead creates an independent contractual obligation that Lady Luck (now Isle of Capri) owed to a third party (UMB). The third sentence in section 17 reads:
LADY LUCK agrees that for the Primary Term, regardless of earlier termination, LADY LUCK will not, nor will any LADY LUCK assignee, subsidiary, affiliate or joint venture or partnership described above, permit any banking institution, other than United Mississippi Bank or such other banking *601 institution as James M. Biglane may designate to utilize any portion of the Leased Premises or any vessels owned or controlled by LADY LUCK, its assignees, subsidiaries, affiliates or joint venturers or partners, and docked thereon in Natchez or any portion of any other gaming vessel owned or controlled by LADY LUCK, its assignees, subsidiaries, affiliates, joint venturers or partners within the State of Mississippi, for a banking facility or automatic teller machine.
(Emphasis added).
¶ 52. The contractual obligation under this sentence benefits UMB and Biglane. This sentence obligates Lady Luck to use UMB, or a bank designated by Biglane, as the exclusive banking facility and ATM provider for: (1) the Natchez casino, and (2) “any other gaming vessel owned or controlled by LADY LUCK, its assignees, subsidiaries, affiliates, joint venturers or partners within the State of Mississippi.” (Emphasis added).
¶ 53. This case does not deal with the Natchez casino. UMB is presently the banking facility and ATM provider at the Natchez casino. There has been no attempt to assign or transfer the Natchez casino. It is still owned by Lady Luck (IOC-Natchez, Inc.).
¶ 54. The issue is whether Isle of Capri breached this provision because Legends could be interpreted to be an “assignee” under this provision.
¶ 55. Silver Land claims its position is simple. “Assignee,” as used in Section 17, refers to an “assignee,” not an “assignee under the [Natchez] Lease.” Silver Land argues that the term “assignee” must be given its plain meaning, which is “a person to whom an assignment is made; grantee.” Black’s Law Dictionary, Centennial Edition (1991). An “assignment” is just “the act of transferring to another all or part of one’s property, interest, or rights.” Black’s Law Dictionary, Centennial Edition (1991). Silver Land argues that because Isle of Capri transferred its property, rights, and powers in the Vicksburg casino to Legends, Legends is its assignee. The fact that Legends is not a subsidiary or affiliate, nor a part of a joint venture or partnership that includes Lady Luck or Isle of Capri, is of no consequence. The circuit court accepted Silver Land’s interpretation.
¶ 56. Isle of Capri argues that there is a more limited interpretation of the term “assignee” in section 17. Isle of Capri contends that “assignee” means only an entity assigned the Natchez Lease. Hence, because it did not “assign” the Natchez Lease to Legends, Isle of Capri argues that its promise to forbid any other bank from operating at its assignees’ locations is inapplicable.
¶ 57. The first two sentences of Section 17 clearly define Lady Luck’s (now IOC-Natchez, Inc.) right to “convey and assign and sublease its rights which it acquires from Silver Land.” Isle of Capri, as the parent corporation of Lady Luck (IOC-Natchez, Inc.) could only transfer Lady Luck’s rights under the Natchez casino to a “subsidiary,” “affiliate,” or “joint venturer or partnership in which LADY LUCK or such subsidiary or other affiliate is a joint venture or partner.” The term “as-signee” under this part of Section 17 would not include Legends. The first two sentences of section 17 would prohibit Lady Luck or Isle of Capri from any attempt to transfer its rights under the Natchez Lease to Legends.
¶ 58. The third sentence in section 17, which provides for the exclusive right for ATM operation, applies to “any other gaming vessel owned or controlled by LADY LUCK.” This provision may not be inter *602 preted to limit or encumber Lady Luck (IOC-Natchez, Inc.) or Isle of Capri from buying or selling other gaming vessels. It may and has been be interpreted to limit or encumber “any gaming vessel owned or controlled by” Isle of Capri.
¶ 59. We interpret the third sentence of section 17 to apply only to gaming vessels under the current ownership or control of Isle of Capri. Upon the sale of the Vicksburg casino to Legends, it was no longer owned or controlled by Isle of Capri.
¶ 60. We also reject Silver Land’s argument that the definition of “assignee” is a simple dictionary-definition interpretation. Section 17 reads “LADY LUCK will not, nor will any LADY LUCK assignee, subsidiary, affiliate or joint venture or partnership described above, permit any banking. ...” (Emphasis added). Our analysis requires that we consider what was meant by the use of the term “assignee” and “described above” in the same sentence. The use of “described above” can only refer to the first sentence of Section 17, which states that “LADY LUCK may ... assign ... its rights ... to any subsidiary or other affiliate or to any joint venture or partnership in which LADY LUCK or such subsidiary or other affiliate is a joint venturer or partner.” We conclude that the use of the word “assignee” in the third sentence in section 17 is limited by the first sentence and may not be interpreted to include Legends.
¶ 61. Therefore, as a matter of law, we find that section 17 of the Addendum was not breached by Isle of Capri when the Vicksburg casino was sold to Legends. Instead, Isle of Capri’s obligations to Silver Land for the exclusive ATM operations by UMB or Biglane, under Section 17, ended when the Vicksburg casino was sold to Legends. Other than the Natchez property, Isle of Capri had no contractual duty under the Natchez Lease that would prohibit or otherwise limit its right to sell, convey, or transfer a casino or property. We find no breach of the Natchez Lease.

2. The ATM Agreement

¶ 62. Silver Land also claims that Isle of Capri breached paragraphs 1 and 4 of the ATM Agreement. Silver Land claims that it had the exclusive right to operate at least four ATMs at the Vicksburg casino for the primary term of the agreement (i.e., forty years). Despite this obligation, Silver Land was ordered to remove its ATMs from the Vicksburg casino after the sale to Legends; another bank now provides services at that location.
¶ 63. Isle of Capri argues that the ATM Agreement was not breached when the Vicksburg casino was sold to Legends without the assignment of the ATM Agreement. Isle of Capri points to paragraph 1 of the ATM Agreement to claim that the Isle of Capri granted Silver Land only “exclusive rights to provide ATM services in hotel and theater pavilions at Tunica and Vicksburg in addition to rights currently possessed by Silver Land to provide such services on all vessels at casino locations in Mississippi.” Then, Isle of Capri points to paragraph 4 to argue that “Silver Land agrees to provide ATM Services (as defined below) to the Isle at the following Mississippi locations: ... Vicksburg....” (Emphasis added). Isle of Capri concludes that providing ATM services on the Vicksburg casino, which was no longer owned or controlled by Isle of Capri’s subsidiary, would not have satisfied Silver Land’s obligations to provide services to the “Isle [of Capri].” As a result, Legends decision to use a bank other than UMB in its Vicksburg casino was not a breach of the ATM Agreement by Isle of Capri.
*603 ¶ 64. The ATM Agreement is still in effect. All of Isle of Capri’s casinos named in the ATM Agreement currently operate under the ATM Agreement. After Riverboat-Vicksburg sold its Vicksburg casino to Legends, Isle of Capri, through a subsidiary, acquired another Vicksburg casino. And Silver Land has received ATM income from the newly acquired property, under the ATM Agreement, since the property was acquired.[2]
¶ 65. The following provisions of the ATM Agreement are relevant:
WHEREAS, Silver Land, Inc., a Mississippi corporation (“Silver Land”) and Lady Luck Mississippi, Inc., a Mississippi corporation (“Lady Luck”) are parties to an Amended and Restated Lease Agreement (“Lease”) dated October 31, 1992.
WHEREAS, as part of the Lease, Silver Land and Lady Luck agreed that Lady Luck would not permit any banking institution other than United Mississippi Bank to utilize any portion of the leased premises or any vessels owned or controlled by Lady Luck for a banking facility or Automated Teller Machine (“ATM”) Services.
WHEREAS, Silver Land and Lady Luck amended certain provisions of the Lease by that First Addendum to Amended and Restated Lease Agreement dated August 21, 1998 (“Addendum to Lease”).
WHEREAS, as part of the Addendum to Lease, Lady Luck granted to Silver Land the exclusive right to provide ATM Services upon the Leased Premises or any Mississippi vessels owned or controlled by Lady Luck, its assignees, subsidiaries, affiliates or joint venturers or partners.
WHEREAS, Isle of Capri Casinos, Inc. a Delaware corporation (“Isle”) has acquired Lady Luck Gaming Corporation (“LLGC”) and its subsidiaries, including Lady Luck.
WHEREAS, Isle of Capri Casinos, IWHEREAS, Isle currently maintains Mississippi operations in Lula, Natchez, Tunica, Vicksburg and Biloxi, Mississippi.
NOW THEREFORE, in consideration of the mutual promises, covenants and other valuable consideration herein expressed, the parties hereto agree as follows:
1. Services to be Provided by Isle. Isle hereby grants Silver Land exclusive rights to provide ATM services in hotel and theater pavilions at Tunica and Vicksburg in addition to rights currently possessed by Silver Land to provide such services on all vessels at all casino locations in Mississippi.
4. Services to be Provided by Silver Land. In consideration for the rights granted by Isle to Silver Land as set forth herein, Silver Land agrees to provide ATM Services (as defined below) to the Isle at the following Mississippi locations: Natchez (a minimum of 3 ATMs to be installed and maintained at locations identified by the Isle), Lula (a minimum of 5 ATMs to be installed and maintained at locations identified by the Isle), Tunica (a minimum of 3 ATMs to be installed and maintained at locations identified by the Isle) and Vicksburg (a minimum of 4 ATMs to be installed *604 [and] maintained at locations identified by the Isle)....
7. New Isle Locations. In the event the Isle shall acquire or establish other locations in the State of Mississippi, such location(s) shall become subject to the terms of this Agreement....
8. Assignment. Silver Land may assign its rights and obligations under the Agreement to any Silver Land assignee, subsidiary or affiliate. Silver Land shall provide Isle with advanced notice of any assignment, and provided further Isle’s rights hereunder shall not be prejudiced or adversely affected.
9. Ratification. The provisions of that Lease, as amended by the Addendum to Lease dated August 21, 1998, in particular, Section 17 thereof, remain in effect and are in full force and effect other than as specifically clarified hereby.
10. Termination. This Agreement will remain effective and will run concurrently with the primary term of the Lease and will terminate upon: (a) the date the Primary Term of the Lease expires (see Paragraph 5 of the Addendum to Lease) or (b) if Silver Land fails to provide ATM Services as described herein, and after having been provided with notice, fails to cure or remedy the default within ten (10) days.
¶ 66. After the review of the four corners of the ATM Agreement, we are of the opinion that the ATM Agreement is not ambiguous. In fact, we agree with the interpretation offered by Isle of Capri.
¶ 67. The ATM Agreement does not prohibit or limit the sale of any casino or property by Isle of Capri. Paragraph 8 allows Silver Land to “assign its rights and obligations under the Agreement,” but there is no similar or contrary provision that prohibits or otherwise limits Isle of Capri selling a casino or property. More importantly, there is no provision that requires Isle of Capri to assign the ATM Agreement to any purchaser of any Isle of Capri casino or property.
¶ 68. The ATM Agreement does contemplate the addition of locations purchased by Isle of Capri. Paragraph 7 provides that “New Isle Locations” are subject to the terms of the agreement. There is an absence of any provision as to how locations sold by Isle of Capri would be treated. However, the recitations paragraphs seem to fill in the blanks. The recitation paragraphs use the present tense to determine the properties “owned and controlled” are to be included under the terms of the agreement. For example,
WHEREAS, as part of the Lease, Silver Land and Lady Luck agreed that Lady Luck would not permit any banking institution other than United Mississippi Bank to utilize any portion of the leased premises or any vessels owned or controlled by Lady Luck for a banking facility or Automated Teller Machine (“ATM”) Services.
■WHEREAS, as part of the Addendum to Lease, Lady Luck granted to Silver Land the exclusive right to provide ATM Services upon the Leased Premises or any Mississippi vessels owned or controlled by Lady Luck, its assignees, subsidiaries, affiliates or joint venturers or partners.
■WHEREAS, Isle of Capri Casinos, Inc. a Delaware corporation (“Isle”) has acquired Lady Luck Gaming Corporation (“LLGC”) and its subsidiaries, including Lady Luck.
WHEREAS, Isle currently maintains Mississippi operations in Lula, Natchez, Tunica, Vicksburg and Biloxi, Mississippi.
*605 ¶ 69. Paragraph 4 indicates that Silver Land’s services, i.e., the ATM operations, are provided “to the Isle at the following Mississippi locations: ... Vicksburg.” (Emphasis added). The actual language used is important. Silver Land’s services are provided “to the Isle.” If Isle of Capri no longer owns the location, then there is no reason to provide a service “to the Isle.”
¶ 70. We also find it is significant to note that the ATM Agreement is still in effect. All of casinos that are owned or controlled by Isle of Capri, and its subsidiaries, continue to honor the ATM Agreement. After the sale to Legends, Isle of Capri acquired another Vicksburg casino. This Isle of Capri-owned casino is in compliance with the ATM Agreement, and Silver Land is receiving compensation under the ATM Agreement.
¶ 71. Based on our reading of the ATM Agreement, we do not find, as a matter of law, that Isle of Capri and Riverboat-Natchez breached the ATM Agreement by the sale of the Vicksburg casino to Legends. Therefore, as a matter of law, we find that the ATM Agreement was not breached by Isle of Capri when its subsidiary, Riverboat-Vicksburg, sold the Vicksburg casino to Legends. Instead, Isle of Capri’s obligations to Silver Land for the exclusive ATM operations by UMB or Biglane, under the ATM Agreement, ended when the Vicksburg casino was sold to Legends. We find no breach of the ATM Agreement.

3. Conclusion

¶ 72. Isle of Capri and Riverboat-Vicksburg have asked this Court to grant them a judgment as a matter of law and dismiss this action. We find that the circuit court was in error to enter the partial summary judgment as to liability in favor of Silver Land. Therefore, we reverse the judgment entered in favor of Silver Land. In addition, we find no genuine issues of a material fact to be in dispute and conclude that Isle of Capri and Riverboat-Vicksburg are entitled to a judgment as a matter of law. Accordingly, we render judgment in favor of Isle of Capri and Riverboat-Vicksburg.
¶ 73. THE JUDGMENT OF THE ADAMS COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.

. Section 43 of the Original Lease defined "Affiliates” as follows:
For the purposes of this Lease Agreement, any person or entity directly or indirectly controlling, controlled by or under direct or indirect common control of a party shall be deemed an affiliate of such party. In any event, any entity in which either party and/or other affiliates of such party owns fifty percent (50%) or more of the voting *592 stock or equity interest will be deemed an affiliate of such party.

. Isle of Capri also argues that, if Silver Land’s argument is accepted, the damages awarded by the jury must be reduced to be consistent with the limited time during which Isle of Capri's subsidiaries owned no casino in Vicksburg. Because we reverse the jury verdict and render this case for further proceedings, it is not necessary that we address this argument.